**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 01-20845
_____

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellant,

versus


JACOBO ISAIAS CHAVEZ,

                                        Defendant-Appellee.

_____


Appeal from the United States District Court
for the Southern District of Texas

_____
February 4, 2002

Before POLITZ, HIGGINBOTHAM and CLEMENT, Circuit Judges.

CLEMENT, Circuit Judge:

     The government appeals from the district court's order granting the defendant's motion to suppress and dismissing the indictment with prejudice.  For the following reasons, we reverse the district court's suppression ruling, vacate the district court's order of dismissal, and remand for further proceedings consistent with this opinion.

                          I.

     In the early morning hours of May 19, 2001, Jacobo Isaias Chavez was working as a uniformed and visibly armed security guard

stationed outside of the Fiesta Latina Nightclub ("the club") in Houston, Texas. At approximately 4:00 a.m., law enforcement agents converged at the club in connection with "Operation Bar Fly," a multi-agency investigation of nightclubs engaged in the unlawful after-hours sale of alcoholic beverages.[1] After undercover Texas Alcohol Beverage Commission ("TABC") agents entered the club and were served alcohol in violation of Texas liquor laws,[2] two Harris County sheriff's deputies approached Chavez and, speaking in English, requested to see his driver's license and security officer's commission (which confers authority to carry a firearm). Chavez complied with the officers' request.

While retaining Chavez's license and commission, but without taking his gun, the officers instructed Chavez to accompany them to a location across the club's parking lot, allegedly because the deputies had trouble communicating with Chavez in English and needed translation assistance. They brought Chavez to Immigration and Naturalization Service ("INS") agent Richard D. Perez,[3] who,

---

[1] Operation Bar Fly was a joint effort by the Texas Alcoholic Beverage Commission, the Harris County Sheriff's Office, the Houston Police Department, the Texas Commission on Private Security, the Immigration and Naturalization Service, and the Bureau of Alcohol, Tobacco and Firearms.

[2] Texas law prohibits the sale of alcohol after 2:00 a.m.

[3] The testimony adduced at the suppression hearing was inconsistent as to whether Chavez was brought across the parking lot to Perez or whether Perez came to Chavez where Chavez was standing with the deputies. Chavez testified that Perez came to him, whereas agent Perez testified that the deputies brought Chavez to him. The district court credited Perez's version of

2

speaking in Spanish, identified himself as an INS agent and asked Chavez two questions relative to his immigration status. Chavez readily responded that he was a Mexican national in the United States illegally. Immediately thereafter, agents with the Bureau of Alcohol, Tobacco and Firearms arrested Chavez and seized his firearm.

Chavez was indicted on one count of being an alien in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2). Thereafter, he moved to suppress his statements and the firearm, advancing several alternative theories: (1) that he was seized without reasonable suspicion in violation of the Fourth Amendment; (2) that he was not apprised of his Miranda rights in contravention of the Fifth Amendment; and (3) that his arrest was the result of a racial profiling scheme violative of Fourteenth Amendment equal protection guarantees.

After a hearing, the district court granted Chavez's motion to suppress on Fourth Amendment grounds.[4] The court observed that the initial encounter in which the officers requested to see Chavez's license and commission was constitutionally permissible, but found that Chavez was "temporarily detained to ascertain whether he was legally carrying a permit for the firearm." Finding that there was

_____

the facts.

[4] Because it ruled in favor of Chavez on his Fourth Amendment claim, the district court did not find it necessary to reach Chavez's Fifth and Fourteenth Amendment arguments.

3

no sufficiently particularized reason to further question Chavez once he provided the requested documentation, the court concluded that the officers lacked reasonable suspicion to continue their questioning. On this basis, the court entered an order dismissing the indictment with prejudice. The government timely filed a notice of appeal. Counsel for Chavez conceded in his brief and at oral argument that the district court's dismissal of the indictment was erroneous.

II.

A.

In considering a ruling on a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions, including its ultimate conclusion as to the constitutionality of the law enforcement action, de novo. United States v. Carreon-Palacio, 267 F.3d 381, 387 (5th Cir. 2001). We view the evidence in the light most favorable to the party that prevailed in the district court — in this case, Chavez. United States v. Jordan, 232 F.3d 447, 448 (5th Cir. 2000).

1.

The government contends that Chavez's entire encounter with law enforcement authorities, including his interaction with agent Perez, was merely a police-citizen encounter that did not rise to the level of a Fourth Amendment seizure. Chavez conceded in the district court that his initial encounter with the deputies in

4

which they asked him for his license and commission did not offend the Fourth Amendment. However, Chavez urged, and the district court agreed, that the encounter was transformed into a detention subject to Fourth Amendment protection when the deputies, after receiving satisfactory proof of his identification and authority to carry a weapon, took Chavez to agent Perez for further questioning.

Not every encounter between a citizen and a police officer implicates the Fourth Amendment. INS v. Delgado, 466 U.S. 210, 215 (1984). Generally, police questioning, by itself, does not fall within the ambit of Fourth Amendment protections. Id. at 216. However, an initially consensual encounter may ripen into a seizure requiring reasonable suspicion or probable cause if an officer, by means of physical force or show of authority, restrains the liberty of a person. Id. at 215.

Chavez's encounter with police occurred while he was working as a security guard. As the Supreme Court observed in INS v. Delgado, 466 U.S. at 218, "when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." Where movement is restricted by a factor independent of police conduct, the proper inquiry is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 436 (1991). We must consider all the circumstances surrounding the encounter and ask whether the

5

officers' conduct would have caused a reasonable person to believe that he was not free to ignore the police presence and go about his business. Id. at 437. The "reasonable person" test presupposes an innocent person. Id. at 438.

In support of his contention that he was seized, Chavez relies on the Supreme Court's plurality decision in Florida v. Royer, 460 U.S. 491 (1983). There, two plain-clothes airport detectives approached Royer on an airport concourse and requested to see his airline ticket and driver's license. Without returning the ticket and license, the detectives asked Royer to accompany them to a small room approximately 40 feet away, and Royer complied. The Supreme Court found the officers' initial conduct in requesting Royer's ticket and license was permissible, but concluded that the encounter ripened into a detention for the purposes of the Fourth Amendment "when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart." Id. at 501.

Royer is factually similar to this case in that the officers brought Chavez to another location while retaining his documentation. But Royer is readily distinguishable from the other facts of this case. Here, the entire encounter took place in a public setting; unlike Royer, Chavez was not taken to a small room outside of the public's view, but remained in a crowded parking lot

6

at all times.  In addition, Chavez was never told that he was suspected of criminal activity.  To the contrary, there is some indication in the record that because of the apparent language barrier between Chavez and the deputies, Chavez was brought to agent Perez merely for translation assistance, not to "hold" Chavez for a criminal investigation.

This case presents another fact not present in Royer: Throughout the encounter, Chavez remained in control of his firearm despite the officers' knowledge that he was armed.  Notably, at no time prior to his formal arrest did the officers attempt to remove his gun from him.  We find the suggestion that a reasonable person would believe that he was not free to leave while he remained visibly armed with a firearm untenable.

Further, there is no record evidence that the officers' conduct was accompanied by any coercive show of authority (e.g., use of a commanding tone of voice, physical contact with Chavez, etc.).  Chavez testified that none of the officers had their guns drawn at any time during the incident and that no one told him that he was not free to leave.  We also observe that Chavez was working as a security guard at the time of his alleged seizure.  Chavez acknowledged that in his capacity as a security guard, he routinely dealt with law enforcement officers.  This fact necessarily factors into our analysis, for it follows that a reasonable person working as a security guard would not be inclined to find this type of contact with law enforcement coercive.

7

Considering all the circumstances surrounding this encounter, we find that a reasonable person in Chavez's position would have felt free to ignore the officers' questioning. On balance, the evidence does not reveal a coercive atmosphere; rather, the record indicates that Chavez, an armed security guard accustomed to dealing with law enforcement, voluntarily answered agent Perez's brief questions.

In reaching this conclusion, we underscore that the relevant inquiry requires consideration of the totality of the circumstances present in a specific case. No one factor is necessarily determinative. Indeed, the Supreme Court in <u>Royer</u> indicated that there was no litmus test for determining whether a consensual encounter escalates into a seizure. <u>Royer</u>, 460 U.S. at 506. Our consideration of the totality of the circumstances present in this case reveals that the officers' conduct was not sufficiently coercive to transform this consensual encounter into a detention. As such, the district court erred when it found otherwise.

2.

Even if Chavez had been seized, we find that there is ample evidence in the record that the officers possessed reasonable suspicion sufficient to detain Chavez. An officer may, consistent with the Fourth Amendment, temporarily detain a person when the officer has a reasonable, articulable suspicion that a person has committed or is about to commit a crime. <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968). Reasonable suspicion has been described as "'a

8

particularized and objective basis' for suspecting the person stopped of criminal activity," Ornelas v. United States, 517 U.S. 690, 696 (1996); to satisfy Fourth Amendment dictates, the stopping officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." Illinois v. Wardlaw, 528 U.S. 119, 123-24 (2000). Thus, "[w]hile 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Id. at 123. In assessing the validity of a stop, the court considers "the totality of the circumstances — the whole picture." United States v. Sokolow, 490 U.S. 1, 7-8 (1989).

In this case, the government advances two bases for reasonable suspicion. First, it maintains that the agents had reasonable suspicion to believe that Chavez was aiding and abetting the club's illegal activities. Second, the government asserts that the officers possessed a reasonable suspicion that Chavez was an undocumented alien. Chavez contests both of the government's contentions.

In view of all the circumstances surrounding this incident, we conclude that there was reasonable suspicion that Chavez was an illegal alien. According to an INS memorandum of investigation introduced by Chavez at the suppression hearing, the targeted clubs "employ armed security guards that are facilitating many of the

9

[illegal] activities" inside the bars and "[o]n previous occasions these private security guards have been found to be in the country illegally and charged with 18 U.S.C. 922(g), illegal alien in possession of a firearm." The memorandum goes on to list several security guards who were charged with being an alien in possession of a firearm. Moreover, Chavez was in a location of known criminal activity — at approximately 4:00 a.m., he was outside a nightclub that law enforcement agents had determined was operating illegally. See Wardlaw, 528 U.S. at 124 (stating that the characteristics of a location factor into the Terry reasonable suspicion analysis). In addition, it is undisputed that Chavez does not speak English fluently; agent Perez testified that the sheriff's deputies brought Chavez to him for translation assistance. Given his alleged status as a licensed security guard, Chavez's poor English-speaking ability dovetails with the report that the clubs were employing illegal aliens as security guards. The totality of this evidence convinces us that there was a justifiable reason to suspect Chavez of being an alien and to question him further. Accordingly, the district court erred in granting Chavez's motion to suppress and in dismissing the indictment on that basis.

B.

As noted above, because the district court found the Fourth Amendment claim dispositive, it did not reach Chavez's alternative arguments under the Fifth and Fourteenth Amendments, namely that his incriminating statements were obtained in violation of Miranda

10

and that his arrest was the consequence of an illegal racial profiling operation.[5]  We find that the proper resolution of these remaining issues is "beyond any doubt," and therefore we exercise our discretionary authority to decide them on this appeal. Singleton v. Wulff, 428 U.S. 106, 121 (1976); see Green v. Levis Motors, Inc. 179 F.3d 286, 293 (5th Cir. 1999).

1.

Chavez maintains that the incriminating statements he made in response to agent Perez's questioning are inadmissible because they were obtained in violation of his Fifth Amendment privilege against self-incrimination as guaranteed by Miranda v. Arizona, 384 U.S. 436 (1966).  We find this argument unavailing.

Miranda's procedural safeguards attach "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" Stansbury v. California, 511 U.S. 318, 322 (1994).  To ascertain whether an individual was in custody, we examine all of the circumstances surrounding the interrogation, but ultimately ask "whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  Id.

It is clear from the record that Chavez was not in custody within the meaning of Miranda.  We have already examined the circumstances surrounding Chavez's police encounter and concluded

---

[5]  At oral argument, Chavez argued that the district court has already found that Operation Bar Fly targeted Latino clubs. Although the district court did state as much, it did not address the legal consequences of that fact.

that he was not seized within the meaning of the Fourth Amendment. That analysis is relevant here and causes us to conclude that Chavez was not under arrest or subject to a restraint of his freedom comparable to formal arrest. Chavez was never told that he was under arrest or that he could not leave. There is no evidence that the officers threatened or physically restrained him in any way. Given these circumstances, it is clear that Chavez was not in custody at the time he admitted that he was in the country illegally. Therefore, the officers' questioning did not constitute a custodial interrogation requiring the issuance of <u>Miranda</u> warnings.

2.

Chavez also sought the exclusion of his statements and the gun on the ground that his arrest was the result of illegal racial profiling in violation of the Equal Protection Clause. In support of this allegation, Chavez points to an INS memorandum of investigation that states that Operation Bar Fly targeted 100 Latino bars on the night in question.

Neither the Supreme Court nor our Court has ruled that there is a suppression remedy for violations of the Fourteenth Amendment's Equal Protection Clause, and we do not find it necessary to reach that issue here. For even if we assume arguendo that the Fourteenth Amendment does provide such an exclusionary remedy, it is plain that Chavez has failed to offer proof of discriminatory purpose, a necessary predicate of an equal

12

protection violation.  See Washington v. Davis, 426 U.S. 229, 239-42 (1976) (requiring proof of discriminatory intent in equal protection cases).  Neither the testimony adduced at the hearing nor the INS memorandum reveals any intention to impermissibly target only Latino clubs, much less to target Chavez individually.[6]  Absent proof of discriminatory intent, Chavez's equal protection claim fails.

### III.

For the foregoing reasons, the district court's order granting Chavez's motion to suppress is reversed, the order of dismissal is vacated, and the case is remanded for further proceedings consistent with this opinion.

REVERSED, VACATED AND REMANDED.

---

[6] Indeed, the testimony at the hearing suggested that the government had a legitimate, non-discriminatory basis for selecting the clubs targeted in connection with Operation Bar Fly.  TABC agent Michele Carr testified that the clubs were targeted because of their history of complaints or cases of selling liquor after hours.  The INS memorandum further identifies the after hours sale of alcoholic beverages as contributing to various offenses associated with the clubs, including gang violence, fighting, and illegal drug trafficking.

13