UNITED STATES of America,

v.

Rafael Nambo LUGO.

Criminal No. B–03–M–2677–1.

United States District Court,
S.D. Texas,
Brownsville Division.

Oct. 23, 2003.

Jeff Wilde, Federal Public Defender's Office, Brownsville, TX, for Defendant.

Terra Bay, AUSA, Brownsville, TX, for Government.

## MEMORANDUM OPINION
## AND ORDER

RECIO, Magistrate Judge.

Rafael Nambo Lugo, Defendant in the above-captioned cause, is charged with knowingly and unlawfully entering the United States in violation of Title 8 U.S.C. § 1325(a)(1). A bench trial was held on October 17, 2003. Carried along at trial was Defendant's Second Motion to Suppress Statements, which was filed the day before trial. For the reasons set out below, the Defendant's Motions to Suppress are DENIED and judgement of GUILT is to be entered against the Defendant.

### I.

### PROCEDURAL & FACTUAL
### BACKGROUND

Rafael Nambo Lugo ("Defendant" or "Nambo") was serving time in the Cameron County Jail on a state offense when, during a routine investigation, he was interviewed by a Border Patrol agent. Apparently Immigration agents commonly question incarcerated individuals as part of the BORCAP program.[1] Because the BORCAP program and its modus operandi play a significant role in this case, a brief description of the program will prove illuminating.

Though presumably BORCAP agents have a variety of duties, one of their primary functions is to contact local jails by telephone or in person to check for illegal aliens who have been convicted of crimes.

---

1. BORCAP stands for "Border Patrol Criminal Alien Program." *See United States v.* *Ortega,* 203 F.3d 675, 681 n. 3 (9th Cir.2000).

*U.S. Immigration and Naturalization Service, U.S. Border Patrol, Del Rio,* 47 F.L.R.A. No. 15 (1993). While the specific practices of various units apparently differ, in Cameron County BORCAP agents routinely visit local jails and line up inmates. The inmates are, one by one, asked a series of questions, including their name, date of birth, citizenship, and alien status. Based on their answers, individuals who are determined to be in the United States illegally have a detainer placed on them, so that when they are released from jail they will be transported to the Border Patrol station for processing.

That is precisely what happened to the Defendant in the case at hand. In other words, Nambo was asked his name, date of birth, citizenship, and alien status while being detained at the jail for a state offense. Because his answers indicated that he was in the United States illegally, a detainer was placed on him. As a result, when Nambo was released from jail he was transported to the Border Patrol Office for processing. The factual details up to this point are not a matter of dispute. However, the events that occurred after Nambo was transported to the Border Patrol station are, to some extent, a matter of contention.

What is clear is that Nambo was *"mirandized"* upon his arrival at the Border Patrol office. In other words, the Border Patrol agents clearly read and provided the Defendant with a written copy of his rights in Spanish. At 3:00 PM the Defendant signed a waiver of his right to an attorney. *See* Government Exhibit # 1. At some point thereafter, the Defendant admitted to entering the United States at a place other than designated by an immigration officer by swimming or wading the Rio Grande River. At some juncture, the interview was terminated when the Defendant asked for an attorney. *See* Government Exhibit # 2.

From the record and evidence, it is clear that all of the above-described events occurred. What is at issue is the timing of some of the particular happenings. More to the point, the Defendant alleges that he asserted his right to an attorney immediately after being read his rights. He further asserts that, though he did sign the waiver, he did so after he had voiced his wish that his attorney be present. In addition, according to the Defendant, he did not know what he was signing and he signed the waiver only because he felt he had to do so.

As a result of the statements given by the Defendant, he was charged with violating federal law—to wit, knowingly and unlawfully entering the United States at a place other than designated by an Immigration Officer, in violation of 8 U.S.C. § 1325(a)(1).

After a representative from the Public Defender's Office was appointed to represent Mr. Nambo, he made his initial appearance before a U.S. Magistrate Judge. At the initial appearance, Defendant asserted that his wife was in the process of hiring an attorney and he thus asked that his case be reset. At his re-arraignment, Nambo appeared, once again with appointed counsel, and entered a plea of not guilty. A bench trial was scheduled, bail was set, and Nambo was remanded into the custody of the U.S. Marshall Service. On the date of the scheduled bench trial, Defendant again appeared with appointed counsel and again asked for a continuance based on his wish to procure a private attorney. The bench trial was reset for October 16, 2003.

Unable to obtain private representation, Nambo appeared for the bench trial with appointed counsel. The bench trial was held, as scheduled, on October 16, 2003. Because the subject matter implicated by the Defendant's motions to suppress was

consubstantial with the substantive issues expected to be raised at trial, the Court decided to carry the motions along at trial rather than hold a separate hearing on the motions to suppress. No objection was offered by either party.

At trial, two witnesses, Agent Brown and Agent Montalvo of the United States Border Patrol, testified for the Government. The Defendant then testified on his own behalf. Because the trial has been completed, the case is ripe for judgment.

## II.

### ANALYSIS

The Defendant was charged pursuant to 8 U.S.C. § 1325(a)(1). Under this statutory provision, any alien who "enters or attempts to enter the United States at any time or place other than as designated by immigration officers" commits a crime. 8 U.S.C. § 1325(a)(1).

As previously mentioned, Defendant filed a Motion to Suppress Statements, which was then superseded by a Second Motion to Suppress Statements. The Defendant's motion is best interpreted as challenging distinct, though interconnected, aspects of the Defendant's dealings with Border Patrol agents.

Defendant first challenges his initial interrogation by the Border Patrol, which occurred while he was incarcerated at the Cameron County Jail. According to the Defendant, the Border Patrol agent's failure to advise him of his privilege against self-incrimination violated his Fifth Amendment rights. Furthermore, Defendant claims that said illegal questioning directly led to the defendant's detainer and subsequent transportation to the Border Patrol Office for processing.

The second aspect of Defendant's Motion to Suppress stems from events that occurred once Nambo arrived at the Border Patrol office. According to the Defendant, he immediately asked for an attorney upon being apprised of his Fifth Amendment rights. He thus argues that any statements he made while being interviewed at Border Patrol headquarters should be suppressed. Because the only evidence regarding the elements of his alleged immigration offense were his own statements—given at the Border Patrol Office—detailing the particulars of his entry into the United States, the suppression of his statements would make it impossible for the government to establish its case against Mr. Nambo.

Although the two parts of Nambo's motion to suppress are interrelated, for purposes of organization and clarity they will be addressed, to the extent possible, individually.

A. *Part One of Defendant's Motion to Suppress: The Propriety of Defendant Nambo's Initial Encounter with Border Patrol at the Cameron County Jail.*

As was noted earlier, Defendant Nambo first encountered Border Patrol agents while incarcerated at the Cameron County Jail for a state offense. According to the Defendant, BORCAP's policy of lining up prisoners and eliciting information regarding citizenship without giving *Miranda* warnings is at odds with the Fifth Amendment of our Constitution.

The Court begins by noting that the issue at hand is, in some sense, novel. Despite the apparent widespread presence of BORCAP units, there is very little case law addressing their activities, or the legitimacy thereof. In fact, a search of federal cases involving BORCAP agents turns up only one decision that directly mentions the unit by name. *See United States v. Ortega*, 203 F.3d 675 (9th Cir.2000).

We clarify that, herein, the legality of BORCAP's general practice of checking

for illegal aliens who have been convicted of crimes is not at issue.[2] The Court is only concerned with the specific issue raised by the Defendant, namely, whether or not a *Miranda* warning is required before questioning inmates about their citizenship.

(1) The Parties' Respective Positions.

According to the Defendant, the BORCAP agent's failure to give *Miranda* warnings before interviewing Nambo at the Cameron County Jail resulted in the defendant's answers to questions about his citizenship being rendered inadmissable. In support of that contention, Defendant cites to *United States v. Mata–Abundiz*, 717 F.2d 1277 (9th Cir.1983); *United States v. Arango–Chairez*, 875 F.Supp. 609 (D.Neb.1994), *aff'd*, 66 F.3d 330, 1995 WL 516200 (8th Cir.1995) (TABLE, NO. 95–1470); and *United States v. Gonzalez–Sandoval*, 894 F.2d 1043 (9th Cir.1990).

The Defendant asserts that BORCAP's practice of interviewing inmates about their citizenship without *Miranda* warnings violates constitutional standards because the defendants are in custody and because the investigator has reason to know that any admission of alienage by a defendant would be highly incriminating. Defendant further argues that any information regarding alien status is solicited for the purpose of, or at least is likely to lead to, prosecution for immigration-related offenses.

The Government counters that, during their visits to local jails, BORCAP agents question every inmate about their citizenship and alien status. According to the Government, this practice is directly related to the statutory authority granted to Immigration officers. *See* 8 U.S.C. § 1357(a)(1). Furthermore, the Government emphasizes that the BORCAP

---

**2.** Although, as noted, the BORCAP program is mentioned by name in only one federal case, immigration agents' practice of scouring local jails for illegal aliens is a fairly widespread and accepted phenomenon. *See United States v. Trevino–Martinez*, 86 F.3d 65, 67 (5th Cir. 1996) (defendant in jail for state DWI charge confessed that he was in country illegally to border patrol agents conducting a routine examination of the jail); *United States v. Garcia–Garcia*, 939 F.2d 230, 231 (5th Cir.1991) (after defendant was found in El Paso county jail by border patrol agent assigned to check jail custody records, INS lodged detainer against defendant who was subsequently charged with immigration offense); *United States v. Quezada*, 754 F.2d 1190, 1191 (5th Cir.1985) (border patrol officer arrested defendant at the El Paso County jail where he was incarcerated on a public intoxication charge); *United States v. Arroyos–Serna*, 17 Fed.Appx. 844, 845, 2001 WL 939783 at *1 (10th Cir. August 17, 2001) (defendant in state custody on misdemeanor charge subsequently charged with federal immigration crime after admitting to border patrol agent doing jail inspection that he was a Mexican citizen); *United States v. Viramontes–Alvarado*, 149 F.3d 912, 914–15 (9th Cir.1998) (defendant

convicted of federal immigration offense after being discovered by border patrol agent at county jail); *United States v. Hernandez*, 105 F.3d 1330, 1331 (9th Cir.1997) (border patrol agent assigned to check jails for illegal aliens discovered defendant in county jail; after defendant was advised of his rights under *Miranda*, defendant admitted to being Mexican citizen and provided details of his illegal entry into United States); *Fernandez v. INS*, 909 F.2d 1488, 1990 WL 113610 at *1 (9th Cir. 1990) (defendant jailed for domestic incident questioned by border patrol agent, which led to prosecution for immigration offense); *United States v. Heredia–Fernandez*, 756 F.2d 1412, 1414 (9th Cir.1985) (border patrol agent found defendant in county jail during daily check of local jails for illegal aliens; defendant was transported to border patrol station, told of his rights under *Miranda*, questioned, and eventually convicted of immigration offenses); *United States v. Schultz*, 2000 WL 33348789 at *2 (W.D.Tex. Dec.6, 2000) (after determining alien status, defendant being held in county jail was taken into custody by border patrol "in order to process him for prosecution" for immigration offense).

agents' role is only that of a fact finder, and that agents have no discretion as to whether a particular individual will be prosecuted. Ultimately, the Government's position is that the routine questioning of inmates about their citizenship is no different than the questions asked of individuals attempting to cross at border checkpoints.

(2) Applicable Legal Standards.

██ It is axiomatic that "the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning." *United States v. Gonzales,* 121 F.3d 928, 939 (5th Cir.1997)(quoting *Illinois v. Perkins,* 496 U.S. 292, 296, 110 S.Ct. 2394, 2396–97, 110 L.Ed.2d 243 (1990)). In other words, *Miranda* warnings must be given prior to custodial interrogation. *United States v. Pofahl,* 990 F.2d 1456, 1487 (5th Cir.1993). The Supreme Court has defined "custodial interrogation" as " 'questioning initiated by law enforcement officers after a person has been taken into custody.' " *Perkins,* 496 U.S. at 296, 110 S.Ct. at 2396–97 (quoting *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966)).

██ A suspect is "in custody" for purposes of *Miranda* when he is placed under formal arrest or when a reasonable person in the position of the suspect would understand the situation to constitute a restraint on freedom of movement to the degree that the law associates with formal arrest. *United States v. Galberth,* 846 F.2d 983, 986 n. 1 (5th Cir.1988); *United States v. Bengivenga,* 845 F.2d 593, 596 (5th Cir. 1988) (en banc).

██ " 'Interrogation,' as conceptualized in *Miranda,* must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). Thus, not every question asked in a custodial setting constitutes an interrogation for *Miranda* purposes. The term "interrogation" refers to "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect." *Innis,* 446 U.S. at 301, 100 S.Ct. at 1690; *Gladden v. Roach,* 864 F.2d 1196, 1198 (5th Cir.1989).

(3) Application of Legal Standards.

In order to rule on the Defendant's Motion to Suppress, the Court must determine whether or not the Border Patrol's initial questioning of Defendant Nambo at the Cameron County Jail constituted a "custodial interrogation." If the brief interview did constitute a "custodial interrogation," then a *Miranda* warning was required.

██ The obvious difficulty with asserting that Defendant was not "in custody" is that, by definition, he was. Nambo was in jail for a state offense, and according to established doctrine a suspect under formal arrest is typically thought to be "in custody" for *Miranda* purposes. *Bengivenga,* 845 F.2d at 596; *see also Battie v. Estelle,* 655 F.2d 692, 699 (5th Cir.1981) (defendant was in custody for *Miranda* purposes because he was confined in county jail).

Some courts have noted that "a prison inmate is not automatically always in 'custody' within the meaning of *Miranda.*" *United States v. Conley,* 779 F.2d 970, 973 (4th Cir.1985), *cert. denied,* 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986); *see also United States v. Smith,* 7 F.3d 1164, 1167 (5th Cir.1993); *United States v. Willoughby,* 860 F.2d 15, 23–24 (2d Cir.1988), *cert. denied,* 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989). However, in the case at hand, it would seem, and this Court finds, that for purposes of analysis under *Miranda* the Defendant was in custody. *See Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) (reject-

ing argument that *Miranda* didn't apply due to fact that defendant was in custody for another offense); *but see United States v. Arango–Chairez*, 875 F.Supp. 609, 614 (D.Neb.1994), *aff'd*, 66 F.3d 330, 1995 WL 516200 (8th Cir.1995) (TABLE, NO. 95–1470).

■ Firstly, and most significantly, Defendant was incarcerated—albeit on a different matter—when the questioning occurred. *See Smith*, 7 F.3d at 1167 ("a prison setting may increase the likelihood that an inmate is in 'custody' for *Miranda* purposes"). The Defendant and other inmates being questioned by BORCAP agents were lined up and asked about their citizenship. BORCAP Agent Brown testified that any inmate who refused to answer would be returned to their cell to reconsider. After allowing time for reconsideration, agents would again attempt to question the inmate. In other words, for all intents and purposes, the incarcerated individuals were not free to refuse to answer the questions, nor were they free to leave. *U.S. v. Chavez*, 281 F.3d 479, 486 (5th Cir.2002)(evidence of threats or physical restraint part of analysis to determine if defendant in custody for *Miranda* purposes); *see also U.S. v. Paul*, 142 F.3d 836, 843 (5th Cir.1998). "The only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation." *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). A reasonable person in the defendant's position would have understood the situation to be a restrictive one; furthermore, the restraint imposed was more than that found in the traditional prison setting. Thus, the Court finds that, for *Miranda* purposes, the defendant was in custody. *Chavez*, 281 F.3d at 486 ("to ascertain whether an individual was in custody, we examine all of the circumstances surrounding the interrogation, but ultimately ask whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest"); *see also Battie*, 655 F.2d at 699 (5th Cir.1981) (defendant was in custody for *Miranda* purposes because he was confined in county jail).[3]

■ The issue then becomes whether the questions asked of the Defendant constituted an "interrogation." As previously noted, in this context "interrogation" is defined as "words or actions that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Gladden v. Roach*, 864 F.2d 1196 (5th Cir.1989).

Although the Fifth Circuit has established case law regarding what constitutes an interrogation under *Miranda*, it has never specifically addressed the issue currently before the Court. The Fifth Circuit came close to deciding the question of whether or not a *Miranda* warning is required before immigration officials ask an individual in custody about his citizenship in the case of *United States v. Martinez*, 512 F.2d 830 (5th Cir.1975). However, after determining that the controversy could be resolved without addressing that

---

**3.** The Court's finding that the defendant was "in custody" for *Miranda* purposes distinguishes this case from those involving routine citizenship checks at fixed checkpoints. Although the Government urges that the situation at hand is analogous to a routine citizenship inquiry at a border checkpoint, such situations have been deemed to not require a *Miranda* warning, in large part, because they are not custodial in nature. *See, e.g., United*

*States v. Bengivenga*, 845 F.2d 593, 598–99 (5th Cir.1988). While the Court agrees that the Fifth Circuit has conclusively determined that initial routine questioning *at the border* does not constitute "custodial interrogation," such situations are distinguishable from the case at hand because, in this case, the Defendant *was* in custody at the time of questioning.

particular issue, the Court decided to "leave it for another day." *Id.* at 832.

As far as this Court can tell, the Fifth Circuit has not had occasion to revisit the issue. The parties seem to have reached the same conclusion, as they both turn to the Ninth Circuit for authority to support their respective positions. Because the Ninth Circuit has directly addressed the issue the Court herein faces, we turn now to that circuit's line of cases addressing whether an "interrogation" occurs when an immigration officer questions an incarcerated individual about his citizenship.[4]

(4) Ninth Circuit Case Law.

In *United States v. Mata–Abundiz*, 717 F.2d 1277 (9th Cir.1983), the Ninth Circuit was faced with a defendant who had been arrested and placed in custody for violating a state statute pertaining to possession of a firearm by an alien. An INS agent visited Mata–Abundiz in jail and questioned him about his citizenship. The INS officer was aware of the charges against the defendant and used the information he elicited to help secure a conviction for federal immigration offenses. The Ninth Circuit reversed the conviction after determining that the INS agent's questioning amounted to an interrogation in violation of *Miranda,* because "[t]he 'background questions' asked related directly to an element of a crime that [the INS official] had reason to suspect." *Id.* at 1280.

The Court held that in-custody interviews by Immigration agents must be preceded by *Miranda* warnings if the questioning is reasonably likely to elicit an incriminating response regarding the defendant's immigration status. *Id.* According to the Court, "the relationship of the question asked to the crime suspected is highly relevant." *Id.*

The Ninth Circuit addressed a similar situation in the case of *United States v. Gonzalez–Sandoval,* 894 F.2d 1043 (9th Cir.1990). In *Gonzalez–Sandoval,* the defendant was arrested on suspicion of being a previously deported alien. While the defendant was being held at a local police department, a U.S. Border Patrol agent, without giving *Miranda* warnings, asked the defendant about his immigration status. Based on the information provided, Gonzalez was charged with a federal immigration violation. After unsuccessfully attempting to suppress the statements regarding his citizenship based on the lack of *Miranda* warnings, the defendant appealed. Relying on its previous decision in *Mata–Abundiz,* the Circuit Court noted that the defendant's immigration status was clearly an element of the crime he was suspected of and therefore *Miranda* warnings should have been given. *Gonzalez–Sandoval,* 894 F.2d at 1046–47.

The Ninth Circuit recently elaborated on the reasoning employed in *Mata–Abundiz* and *Gonzalez–Sandoval,* in *United States v. Salgado,* 292 F.3d 1169 (9th Cir.)

4. There is at least some suggestion that the questions at issue did not constitute an interrogation under the Supreme Court's "booking question" exception. The United States Supreme Court has recognized an exception to the general rules under *Miranda* regarding "routine booking questions." *Pennsylvania v. Muniz,* 496 U.S. 582, 601–02, 110 S.Ct. 2638, 2650, 110 L.Ed.2d 528 (1990). The Fifth Circuit has held that "biographical questions that are part of the booking routine and that are not intended to elicit damaging state-

ments are not interrogation for Fifth Amendment purposes." *Gladden,* 864 F.2d at 1198. Given the fact that the Defendant was already incarcerated, the "booking question" exception, at least by its own terms, seems inapplicable; there was no suggestion that the Defendant had not already been booked when he was interviewed by Border Patrol agents. *See id.* ("it is permissible for officers to ask straightforward questions to secure the biographical data necessary to complete the booking process").

cert. denied, 537 U.S. 1011, 123 S.Ct. 479, 154 L.Ed.2d 413 (2002). In *Salgado*, the defendant was in custody on a state charge that had nothing to do with his alienage when he was questioned by an INS officer about his immigration status. Based on the defendant's responses to her queries, the INS officer had an INS detainer placed on Salgado, so that he would be transferred to INS custody at the completion of his term in state custody. Salgado was not given a *Miranda* warning before being questioned.

As a result of the INS officer's report, Salgado was deported. Upon later returning to the United States, Salgado was once again arrested on state charges and his alien status was once more called into question. Upon being indicted for federal immigration offenses, Salgado moved to suppress statements made to law enforcement agents, including the citizenship information he provided to the INS officer. The Ninth Circuit held that:

> *If* Salgado had been interviewed in connection with a prosecution for violating the immigration laws, or *if* Salgado had been in custody on charges relating to his immigration status, *then* questions about birthplace and citizenship might have been reasonably likely to elicit an incriminating response in which case he should have been *Mirandized* beforehand. We so held in *Mata–Abundiz*. But that is not this case.

*Id.* (emphasis in original)(internal quotations omitted).

Although certain factual details distinguish the case at hand from *Salgado*, the Court finds it to be the most on-point authority available regarding the primary issue we are herein asked to decide. Certainly, the facts in the case *sub judice* are much more analogous to *Salgado* than they are to *Mata–Abundiz* or *Gonzalez–Sandoval.* In those cases, the defendants were being held on immigration-related offenses. The Ninth Circuit distinguished *Salgado* from its predecessors primarily based on the fact that the defendant was in custody for non-immigration-related offenses. Therefore the individual asking questions—i.e., the immigration officer—could not know, based on pending state charges, that a federal criminal prosecution might result.

While the Court is concerned that in the case at hand the immigration officer's biographical questions did lead to a prosecution—which did not occur in *Salgado*—there is testimony to the fact that in Cameron County, BORCAP agents interviewing inmates have no say in whether or not a defendant is ultimately prosecuted.

The question of whether or not a detainee will eventually be prosecuted is relevant only to the extent that it pertains to whether an interrogator's questions are reasonably likely to elicit an incriminating response regarding the defendant's immigration status. In other words, a situation where the individual asking questions has reason to believe that prosecution will result from the information he or she is gathering is more likely to require a *Miranda* warning prior to questioning because, based on the nature of the questions, certain answers should be reasonably expected to lead to prosecution—thus making the answers, by definition, incriminatory.

In the case at hand, there was testimony given by Border Patrol agents that the BORCAP agents limit their questioning to basic biographic information. Furthermore, they ask such questions of *each and every* inmate, with apparently no distinction. In addition, the BORCAP agent—at least in the case at hand—had no knowledge of the nature of the state charges for which Defendant Nambo was being held. Lastly, and perhaps most importantly, as stated earlier, the BORCAP agents have

no discretion regarding whether or not the defendant will be prosecuted or subjected to administrative proceedings. They are merely fact finders, and the subject-matter of their inquiries is limited to name, date of birth, citizenship, and alien status.[5]

All of these factors would suggest, at least according to the standard articulated in *Salgado*, that, given the circumstances, the questions asked by BORCAP agents relating to a defendant's alienage did not amount to a practice the agents should know was reasonably likely to elicit an incriminating response. *See Innis*, 446 U.S. at 301, 100 S.Ct. at 1690; *Gladden v. Roach*, 864 F.2d 1196, 1198 (5th Cir.1989); *Mata–Abundiz* 717 F.2d at 1278 (citing *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir.1981)). Thus, the questioning did not amount to a custodial "interrogation" for constitutional purposes and *Miranda* warnings were not required. *Innis*, 446 U.S. at 301, 100 S.Ct. at 1690; *Pofahl*, 990 F.2d at 1487.

The Court would like to note that our analysis, though perhaps satisfactory given available doctrine, does not completely alleviate the practical concerns stated by the dissent in *Salgado*. *See Salgado*, 292 F.3d at 1175–77. Furthermore, though the Court is confident, given the current status of immigration case law in our Circuit, that the Fifth Circuit would adopt the Ninth Circuit's position articulated in *Salgado*— or one similar thereto—there is precedent, though scant, that may be interpreted as suggesting otherwise. *See, e.g., Gladden v. Roach*, 864 F.2d 1196, 1198 (5th Cir. 1989) ("it is conceivable that questions

about a person's identity or residence could be incriminating" for *Miranda* purposes); *see also Martinez*, 512 F.2d at 832.

However, given that the United States Supreme Court denied certification in *Salgado*, that decision should be afforded the weight commonly ascribed to cases with such a disposition. In other words, as it stands, *Salgado* is the most authoritative disposition available regarding the issue the Court has been presented with. Therefore, the Court is confident that it has reached the proper conclusion, at least according to existing precedent. Although the practice might be overly burdensome, the Court notes that the issue here presented—and conceivably other potential controversies we lack the foresight to predict—could be avoided simply by providing *Miranda* warnings to the subjects of in-custody questioning relating to alienage. *See Martinez*, 512 F.2d at 832, n. 1.

As a result of the above analysis, the portion of Defendant's Motion to Suppress pertaining to questioning at the Cameron County Jail is hereby DENIED.

**B. Part Two of Defendant's Motion to Suppress: Nambo's Statements to Immigration Officials at the Border Patrol Office.**

 According to Defendant Nambo's testimony, after being transported to Border Patrol headquarters, he asserted his desire for an attorney immediately after being told of his rights under *Miranda*. The Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602,

---

5. As previously noted, BORCAP units apparently differ in their operating procedures and structure. A BORCAP unit that operates more closely in conjunction with prosecutors might have led the Court to reach a different result. For example, consider the following description of the Deming, New Mexico BORCAP unit found on the Deming Station's local unofficial website:

BORCAP Unit: The BORCAP unit works apart from and in conjunction with the Prosecutions Unit and works to formally Remove the Criminal Alien from the United States when he/she has been processed through the Federal, State and Local Court or Penal systems.
http://www.geocities.com/Pentagon/7070/history.htm

1627–1628, 16 L.Ed.2d 694 (1966), that once a defendant in custody asks to speak with a lawyer, all interrogation must cease until a lawyer is present. Thus, Nambo argues that any statements he gave after asserting his right to an attorney should be suppressed.

As noted previously, the testimony of the attending border patrol agents contradicts the testimony of Mr. Nambo. According to the agents who were present, Nambo did assert his right to an attorney, but only after he had signed a waiver of said right and after he had detailed the means, place and approximate time of his last illegal entry into the United States. According to the agents who were present, the interview was terminated as soon as Nambo vocalized his desire for an attorney.

After considering the relevant portions of the record and the supporting evidence, the Court finds no reason to discredit the testimony of either the Defendant or the attending Border Patrol agents. In other words, there is no evidence suggesting that either the Defendant or the agents are not telling the truth. For that reason, the Court turns to the evidence on the record to reconcile the discrepancies in the two accounts of what transpired at the Border Patrol office.

According to Government Exhibit Number One, the Defendant signed a document entitled "Aviso De Derechos," which, in Spanish, details the various rights guaranteed to the Defendant. According to the document, Defendant read and understood his rights, and signed a statement declaring his understanding at 3:00 PM. Furthermore, the same document includes a waiver of the Defendant's right to an attorney, which Nambo also signed at 3:00 PM. The Defendant testified that he can read Spanish, and the relevant portions of the document at issue were written in the Spanish language. Therefore, according to the documentary evidence, the Defendant waived his right to an attorney at 3:00 PM.

Thereafter, two significant occurrences transpired. Firstly, the Defendant provided the attending agents with information detailing the means, time, and place of his latest illegal entry into the United States. Secondly, the Defendant vocalized his desire for an attorney and the interview was terminated. Although Government Exhibit Number 2 does not indicate the timing of these two important occurrences, it does show that at some point the interview was terminated at the Defendant's request.

Taking into consideration the existing evidence and the discrepancies in the testimony offered at trial, the Court reaches the conclusion that the best possible explanation for the events at issue can be summarized as follows: at some point after the Defendant waived his right to an attorney, the Defendant described the details of his last illegal entry into the United States. At some point thereafter, the interview was terminated.

Although the Defendant testified that further information was gathered after the interview was "terminated," the existing documentation reflects otherwise. Government Exhibit Number Two, which is a Form I–215, shows that the interview was terminated upon the Defendant's request for an attorney. Therefore, the Court finds no reason to suppress the Defendant's statements made at the Brownsville Border Patrol Station. Accordingly, the portion of Defendant's Motion to Supress pertaining to questioning that occurred at the Border Patrol station is hereby DENIED.

### C. The Court's Conclusions of Law.

As noted above, after carefully considering the relevant portions of the record and any pertinent legal authority, the Court

has determined that the Defendant's Motions to Suppress should be and are hereby DENIED. Therefore, all statements made by the Defendant at Cameron County Jail and at the Brownsville Border Patrol Station are admissible. As a result, the Government has established each of the elements of 8 U.S.C. § 1325(a)(1) beyond a reasonable doubt. In other words, by testimony and record evidence, the Government established that on approximately April 24, 1999, the Defendant, Rafael Nambo Lugo, an alien, waded or swam across the Rio Grande, entering the United States at some point near Brownsville, Texas that was not designated by an Immigration officer as a proper port of entry. Thus, this Court finds the Defendant GUILTY as charged in the criminal complaint in case number B–03–2677–M.

## III.

### CONCLUSION

Based on the above analysis, the Defendant's pending Motions to Suppress are hereby DENIED and judgement of GUILT is to be entered against the Defendant.