United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 25, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 06-60128
Summary Calendar

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SERGIO TRINIDAD VANDYCK-ALEMAN,

Defendant-Appellant.

--------------------
Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:05-CR-129
--------------------

Before SMITH, WIENER, and OWEN, Circuit Judges.

PER CURIAM:[*]

Sergio Trinidad Vandyck-Aleman (Vandyck) appeals his guilty-plea conviction on two counts of firearm possession by an illegal alien, in violation of 18 U.S.C. § 922(g)(5)(A). Vandyck contends that the district court erred by denying his motion to suppress evidence relative to the firearms. We AFFIRM.

Factual Background

At the suppression hearing, Agent Ron Johnson of United States Immigration and Customs Enforcement testified that on July

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

22, 2005, he and other agents, together with officers of the Forest, Mississippi, Police Department, took part in an operation to identify gang members, felons, fugitives, and people who had been deported, in the local Hispanic community, and to attempt to remove them from that community. Eight or nine agents and accompanying police officers went in a caravan of vehicles to an apartment building in Forest, which is in Scott County. As they turned onto the street where the apartment building was located, Agent Johnson testified, a Hispanic female standing in the yard looked up, saw the police car and the convoy of vehicles behind it and turned around and sprinted into the house.

After the task force left the apartment complex, someone noticed another male entering the house to which the agents had seen the woman run. The agents decided to stop and investigate. When asked to explain why they stopped, Agent Johnson testified, "I had seen one individual run into the house, someone else had stated they saw another individual walk into the house and probably within a week of that period in that same area [police] had recovered a lot of fraudulent documents being manufactured for unauthorized aliens." The agents then went to the carport door of the single-family residence and knocked on it. Vandyck came to the door and talked with the agents as they stood outside. No weapons were drawn and no show of force was made.

After the agents identified themselves as immigration service agents, Vandyck told them that he was born in Mexico and

that he did not have any immigration documents. Agent Johnson testified that in asking questions about Vandyck's immigration status he was following the INS policies and procedures "absolutely."[**] Although the agents then realized that Vandyck was an illegal alien and subject to arrest, they were not initially inclined to arrest him. When they asked if he minded if they went into the house to discuss the matter further, Vandyck gave his consent readily. Vandyck told them that the woman who had run into the house and the only other adult in the house, a man, were also illegal aliens.

During the questioning about citizenship status, and out of concern for safety issues, an agent asked Vandyck if there were any weapons in the house. He replied yes, and took agents without hesitation to his bedroom, where they retrieved a 12-gauge shotgun from behind his mattress. When he was asked if there were any other weapons in the house, Vandyck gave them permission to look. They found a 9-millimeter handgun that Vandyck said belonged to him. The indictment alleges his illegal possession of these two firearms.

---

[**] Section 1357(a) of 8 U.S.C. provides in part: "(a) Powers without warrant. Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant – (1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States; (2) to arrest any alien . . . if he has reason to believe that the alien [is illegally in the country and likely to escape]."

Vandyck's Fourth Amendment Claim

Citing the Fourth Amendment, Vandyck asserts that his motion to suppress should have been granted because he did not consent to the equal protection violation that occurred when the officers unlawfully targeted him for investigation on the basis of ethnicity. He asserts that the officers did not have the particularized reasonable suspicion the Fourth Amendment requires to justify questioning him regarding his citizenship status.

In INS v. Delgado, 466 U.S. 210, 212 (1984), however, the Supreme Court held that immigration officers could question an individual although they lacked reasonable suspicion that the individual was an illegal alien. The Court noted that one of its recent cases "plainly implies that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure. . . . [P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation." Id. at 216.

Vandyck relies on Mena v. City of Simi Valley, 332 F.3d 1255 (9th Cir. 2003), vacated and remanded by Muehler v. Mena, 544 U.S. 93 (2005), in support of his argument that his Fourth Amendment rights were violated. In that § 1983 lawsuit against law enforcement officers, the Ninth Circuit ruled that questioning the resident of a house being searched about her immigration status violated the Fourth Amendment. The Supreme Court held, however, that "mere police questioning does not

constitute a seizure." 544 U.S. at 101 (citing <u>Florida v. Bostick</u>, 501 U.S. 429, 434 (1991). The Court concluded: "Hence, the officers did not need reasonable suspicion to ask Mena for her name, date and place of birth, or immigration status." <u>Id.</u>

Accordingly, the questioning of Vandyck did not involve a seizure implicating the Fourth Amendment and the district court's decision to deny the his Fourth Amendment challenge was correct.

<u>The Equal Protection Claim</u>

Vandyck contends that the decision to investigate him violated his equal-protection rights. He relies on <u>United States v. Avery</u>, 137 F.3d 343 (6th Cir. 1997), which states that if race were the <u>sole</u> factor in deciding to investigate someone, that would constitute an equal-protection violation. 137 F.3d at 353-54. The court held, however, that "[a]n officer is not held to a 'suspicion of criminal activity standard' when he embarks to investigate someone. The officer merely is prohibited from his pursuit if he acts based solely on race." <u>Id.</u> at 358. The court held that the defendant had failed to establish an equal-protection violation because there were factors other than race justifying the decision to question him. <u>Id.</u>

In <u>United States v. Lopez-Moreno</u>, 420 F.3d 420 (5th Cir. 2005), <u>cert. denied</u>, 126 S. Ct. 1449 (2006), this court considered a case in which nonworking taillights on a van led to a traffic stop resulting in a conviction for trafficking in illegal aliens. The defendant asserted that racial profiling

resulted in a violation of his Fourth Amendment and equal-protection rights under the Fourteenth Amendment. This court held that the stop and detention was valid and that the officer had reasonable suspicion to inquire into the alien status of the passengers of the van after the records check came back clean. 420 F.3d at 433-34. The court noted that the officer's knowledge about an earlier episode in which a van had been apprehended in that area carrying illegal aliens was a factor that contributed to the reasonable suspicion to further detain and question the van passengers. Id. at 426, 433.

This court held further that the standard of review for Lopez's equal-protection (ethnic profiling) claim was the same as for his Fourth Amendment claim. Id. at 434. Relying on United States v. Chavez, 281 F.3d 479 (5th Cir. 2002), the court held that Lopez-Moreno had failed to prove that the stop and detention were driven by a discriminatory purpose and denied his equal-protection claim. Id. The court iterated its earlier statement in Chavez that there was no Supreme Court or Fifth Circuit authority for the proposition that an equal-protection violation could be remedied by suppressing the evidence flowing from the violation. Id.

Vandyck's racial-profiling argument lacks merit because the testimony does not establish that race was the agents' sole motivating factor or that they knowingly were engaging in any illegal conduct. The ethnicity of the people entering the house,

one at a sprint, was a proper factor to consider.  Although ethnicity generally may play no role in the enforcement of criminal laws of this country, enforcement of the immigration laws demands that the officials focus on individuals most likely to violate those laws.  In the poultry-producing region of Scott County, Mississippi, as the agent testified without contradiction, the population of illegal aliens is predominantly Hispanic, not (non-Hispanic) white.  Accordingly, the district court did not err by finding that the officers' decision to approach Vandyck's house and to question him when he came to the door was justified.  See Lopez-Moreno, 420 F.3d at 434; 8 U.S.C. § 1357(a)(1).

AFFIRMED.