# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 16, 2021

Lyle W. Cayce
Clerk

No. 20-60106

United States of America,

*Plaintiff—Appellant*,

*versus*

Okanlawan O. Norbert,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:19-CR-50

Before Davis, Stewart, and Oldham, *Circuit Judges*.

W. Eugene Davis, *Circuit Judge*:

The Government appeals the district court's ruling granting Defendant-Appellee Okanlawan O. Norbert's motion to suppress evidence that was critical to establish the Government's charge of possession of a firearm by a convicted felon. The district court determined that police officers did not have reasonable suspicion to conduct the investigatory stop of Norbert. Therefore, Norbert's gun and statements to the police were suppressed as "fruit of the poisonous tree." Because the district court did not err in finding that the officers did not have reasonable suspicion to conduct an investigatory stop, we AFFIRM.

No. 20-60106

## I.   BACKGROUND

Norbert was charged in a one-count indictment for possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Following his indictment, Norbert moved to suppress the evidence of the gun and statements that he made to police officers before and after discovery of the gun, arguing that the police lacked any legal basis for the stop that resulted in discovery of the incriminating evidence.

The district court held a suppression hearing, where Investigators Felix McClinton and Kevin Lavine from the Hinds County Sheriff's Office testified. Investigator McClinton testified that on the morning of November 29, 2017, he received a phone call with an anonymous tip that illegal drugs were being sold in the parking lot of the Millsaps Apartments in Jackson, Mississippi. The caller said that she was in management at the apartment complex and described the suspected dealer as a "black male, dark skinned, slender build with gold teeth known as 'N.O.'" who drove a black Infiniti with a license plate of "HVK225." The complainant told McClinton that the alleged drug dealing was a "personal safety issue" and "the residents of the apartment complex were in fear of coming and going." However, McClinton testified that "he [could] not verify that it was someone from management" on the phone and he did not get the caller's name or telephone number. It was also unclear whether the caller witnessed the alleged drug activity herself or if she was only told about it by residents.[1]

---

[1] On direct exam, McClinton said that the caller told him it was a personal safety issue and "[she was] in fear of -- and also the residents of the apartment complex were in fear of coming and going . . . in the parking lot." Based on this testimony, it appears that the caller was reporting on drug activity that residents in the complex had brought to her attention. Later, the court asked McClinton the following question: "So the caller identified herself as someone from management and indicated that -- did she indicate that

No. 20-60106

McClinton testified that he found the tipster to be credible based on his "training and experience." Around 8:00 P.M., McClinton and six to eight police officers went to the apartment complex to investigate the complaint. Upon arrival, McClinton saw "[t]hree to four individuals standing in the parking lot of the apartment complex standing next to some vehicles." McClinton said that he also saw a vehicle and an individual that matched the description provided by the complainant, but he "did not see any drug transactions taking place."

The police officers approached the men in the parking lot and said that they were investigating reported drug activity in the area. McClinton testified that when he asked the men if any of them lived at the apartment complex, none of them said that they did. The officers then conducted pat downs of the men for "officer safety," and the men identified themselves, enabling the officers to check through dispatch to see if any of them had valid warrants or criminal history on record. During the pat down, the officers discovered that one man had a misdemeanor amount of marijuana in his possession, but no evidence was found on Norbert's person.

---

she had seen certain activity?" And McClinton replied, "Yes." Based on this testimony, it appears that the caller herself may have witnessed activity in the parking lot, although the question about "certain activity" makes it unclear what specific activity she saw. A reasonable view of the evidence that the district court was entitled to take was that the caller's statement was so ambiguous that the court was unable to find that she herself witnessed drug activity. She could have been referring to the presence of individuals and vehicles in the parking lot who she did not believe belonged there. The dissent argues that it is clear the caller herself witnessed drug activity in the parking lot. However, the Government admitted during oral argument that the only testimony from the suppression hearing that supports this claim is that McClinton said the caller had witnessed "certain activity," without any further explanation of the activity. Therefore, there is ambiguity about what the caller herself witnessed prior to calling the police.

No. 20-60106

McClinton testified that he then spoke to Norbert, who confirmed ownership of the black Infiniti, which was parked approximately 15 to 20 feet away. McClinton said that he then walked over to the Infiniti, looked in the window, and saw a handgun on the floorboard in front of the driver's seat, near the center console. He testified that he spoke to Norbert briefly, then opened the unlocked car door to secure the handgun due to officer safety concerns, but could not remember if Norbert had given him permission to enter the car.

Meanwhile, Investigator Lavine testified that when the officers arrived at the apartment complex, he saw the black Infiniti and several black men in the parking lot. After the police officers approached the group of men, Lavine said that Norbert walked toward the group from a courtyard area because "he wasn't there originally with the guys." Lavine conducted a pat down of Norbert.[2]

After the pat down, Lavine said that he struck up a conversation with Norbert, who "stated kind of jokingly, 'Man, I started to run, but then I realized there was some more of you all on the other side. So I just turned around and came back.'"[3] Lavine testified that Norbert identified the black

---

[2] There is ambiguity in the record on how the pat downs were conducted, particularly whether all the men were patted down simultaneously or one at a time. However, the Government concedes that it cannot establish that any of the pat downs occurred before Norbert's, including the pat down that revealed the presence of marijuana on one of Norbert's companions.

[3] The dissent attempts to argue that the record suggests that the pat down occurred after Norbert's remark about running. However, the district court in its Memorandum Opinion and Order dated January 13, 2020 laid out the same sequence of events as the majority does: "Investigator Lavine states he conducted a brief *Terry* pat of Norbert. Investigator Lavine also said that he began to speak with Norbert about Norbert's accent . . . Norbert told Investigator Lavine that he had 'started to run but then . . . realized there was some more of you all on the other side.'" "In considering a ruling on a motion to

4

No. 20-60106

Infiniti as his. Lavine then walked over to the car, looked inside the window, and saw a gun wedged between the driver's seat and center console. Lavine testified that Norbert gave the officers consent to enter the vehicle. Lavine also said that the officers knew that Norbert had a felony conviction prior to seeing the gun in the car because they asked all the men for their identification and ran their names to check for criminal histories. After the police officers confirmed with Hinds County dispatch that Norbert had a felony conviction, Norbert was arrested.

Following the suppression hearing, the district court issued a written order granting Norbert's motion to suppress. The district court concluded that: (1) Norbert's detention was properly classified as an investigatory stop, not an arrest; (2) the police officers lacked reasonable suspicion to conduct an investigatory stop of Norbert based on the anonymous tip and insufficient on-scene corroboration or verification of the tip; and (3) Norbert's gun and statements to the police should be suppressed because they derived solely from the illegal stop. The Government timely filed an interlocutory appeal.

## II.   DISCUSSION

### A. Reasonable Suspicion

"In considering a ruling on a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions, including its ultimate conclusion as to the constitutionality of the law enforcement action, de novo."[4] "Factual findings are clearly erroneous only

---

suppress, we review the district court's factual findings for clear error." *United States v. Chavez*, 281 F.3d 479, 483 (5th Cir. 2002). Nothing in the record supports a finding that the district court's factual finding on the sequence of events in this situation was clearly erroneous. Accordingly, we decline to adopt the dissent's version of events.

[4] *United States v. Chavez*, 281 F.3d 479, 483 (5th Cir. 2002).

No. 20-60106

if a review of the record leaves this Court with a 'definite and firm conviction that a mistake has been committed.'"[5] In addition to deferring to the district court's factual findings, "[w]e view the evidence in the light most favorable to the party that prevailed in the district court," which in this case is Norbert.[6] A district court's ruling on a suppression motion should be upheld "if there is any reasonable view of the evidence to support it."[7]

"A temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place; otherwise, evidence obtained through such a detention may be excluded."[8] To determine the reasonableness of such a detention, the court must examine "whether the officer's action was justified at its inception" and whether the officer's subsequent actions were "reasonably related in scope to the circumstances which justified the interference."[9] To establish that a police officer's actions were justified at their inception, the officer must have a reasonable basis to suspect criminal activity.[10] The Government has the burden of proving reasonable suspicion.[11]

---

[5] *United States v. Hearn*, 563 F.3d 95, 101 (5th Cir. 2009) (quoting *United States v. Hernandez*, 279 F.3d 302, 306 (5th Cir. 2002)).

[6] *Chavez*, 281 F.3d at 483.

[7] *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc) (citation omitted).

[8] *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013); *see Terry v. Ohio*, 39 U.S. 1, 29–31 (1968).

[9] *Terry*, 392 U.S. at 20.

[10] *United States v. Martinez*, 486 F.3d 855, 864 (5th Cir. 2007).

[11] *Id.* at 859–60.

No. 20-60106

"The Supreme Court has evinced a strong distrust of anonymous tips. In particular, it has stated an anonymous tip that provides verifiable information as to a person's identity and location, without more, is insufficient to justify an investigative stop."[12] Only "under appropriate circumstances" does an anonymous tip "demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'"[13] To determine if an informant's tip provides reasonable suspicion for an investigative stop, the Fifth Circuit considers various factors, including:

> the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale.[14]

The Government does not challenge the district court's determination that the detention and pat down of Norbert was an investigatory stop that required reasonable suspicion. Instead, the Government contends that the district court erred in concluding the tip was not credible or reliable and the police officers did not properly verify the tip. Moreover, it claims that the district court erred in balancing the factors for determining whether the informant's tip provided reasonable suspicion for the investigative stop, which in turn allowed the police officers to perform a

---

[12] *Id.* at 862.

[13] *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 327 (1990)).

[14] *Martinez*, 486 F.3d at 861 (quoting *United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir. 1999)).

No. 20-60106

protective sweep and seize the gun. This Court will consider each of the factors, in turn.

### 1. *Credibility and Reliability of the Informant*

Tips from known informants who have given police reliable information in the past are generally recognized as credible and reliable.[15] "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated . . . 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'"[16] Even if a tip is anonymous, a specific, detailed description of criminal behavior contemporaneously reported to emergency services by an eyewitness "or made under the stress of excitement caused by a startling event" may bear sufficient indicia of credibility and reliability.[17] Crucially, an anonymous tip must "be reliable in its assertion of *illegality*, not just in its tendency to identify a determinate person."[18] Further, this Court considers statements solicited by police that "fit into the end of an ongoing investigation, rather than prompting the beginning of a new one" to be more credible and reliable than "unsolicited information" about people unknown to the police.[19] As a final note, when an anonymous tipster provides

---

[15] *United States v. Powell*, 732 F.3d 361, 371 (5th Cir. 2013); *United States v. Holloway*, 962 F.2d 451, 460 (5th Cir. 1992).

[16] *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (quoting *White*, 496 U.S. at 329).

[17] *Navarette*, 572 U.S. at 399–400.

[18] *J.L.*, 529 U.S. at 272 (emphasis added).

[19] *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997).

No. 20-60106

information about a suspect's future activity that is verified, it offers added credibility for the tipster.[20]

The district court found that the informant's tip lacked credibility and reliability because the caller did not provide her name or phone number and had no history of reliable reports of criminal activity, and the police officers did not attempt to contact the management at the Millsaps Apartments to determine who made the phone call.

The Government argues that the district court placed too much emphasis on the fact that the informant did not provide her name or phone number and failed to credit McClinton's determination that the caller was credible. The Government emphasizes the fact that the caller considered the suspected drug dealing to be a "personal safety issue" for tenants, and even though the caller was anonymous, she should not be treated any differently from an average citizen providing information to the police. The Government contends that the details the caller provided shows that she had a sufficient "basis of knowledge" to "lend[] significant support to the tip's reliability,"[21] and simply because it was not a 911 call or it lacked contemporaneousness does not mean that the tipster was unreliable.

In this case, the caller was unknown to the police and only identified herself as a manager of the Millsaps Apartments. She did not provide her name, phone number, or any other identifying information, and the police officers did not take any further steps to ascertain her identity or confirm her position as a manager of the apartment complex. "All the police had to go on

---

[20] *See White*, 496 U.S. at 332. For further analysis of tips involving a suspect's future activity, see factor 3.

[21] *See Navarette*, 572 U.S. at 399.

No. 20-60106

in this case was the bare report of an unknown, unaccountable informant" and while "[a]n accurate description of a suspect's readily observable location and appearance" will help the police correctly identify the person being accused, "the tip does not show that the tipster has knowledge of concealed criminal activity."[22] "The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."[23]

Moreover, the information provided was not an emergency reported contemporaneously to 911 that required immediate action, which distinguishes this case from *Navarette v. California*.[24] In *Navarette*, which the Government argues is analogous to the instant case, a tipster called 911 soon after she had been run off the road by a driver who was driving dangerously. The Supreme Court noted "[t]hat sort of contemporaneous report has long been treated as especially reliable."[25] The Court also determined that "[a]nother indicator of veracity is the caller's use of the 911 emergency system" because "[a] 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity."[26] As indicated in this case, the information was not transmitted in a 911 call and no evidence was presented that the Hinds County Sheriff's Office automatically records the calls it receives or the caller's phone number. The caller did not clearly convey what, if anything, she saw involving illegal drug activity, and the officers obviously did not

---

[22] *See J.L.*, 529 at 271–72.

[23] *See id.* at 272.

[24] 572 U.S. at 399–400.

[25] *Id.* at 399.

[26] *Id.* at 400.

conclude that there was any emergency because they arrived at the apartment complex at least eight hours after the call. Therefore, the Government's reliance on *Navarette* is misguided. Finally, although the Government argues that McClinton deemed the caller to be credible based on his "training and experience," it does not otherwise explain how he reached that conclusion.

Accordingly, we conclude that the district court did not err in finding that the credibility and reliability of the informant weighed in Norbert's favor.

### 2. *Specificity of the Information in the Tip*

In this case, the district court concluded that the information provided was specific enough to identify Norbert because it included a description of Norbert, his alias ("N.O."), a description of his car, and his car license plate number. The tip also gave the location of where the alleged drug sales were occurring. Therefore, the district court determined—and the Government agrees—that the tip was "relatively specific" enough and that this factor weighs in the Government's favor. Norbert argues that the description of him as a "black male, dark skinned, slender build with gold teeth" was not specific enough to identify him. Norbert emphasizes the fact that 82.02 percent of Jackson's 160,080 population is "Black or African American" and assuming about one-half of the black people in Jackson are male, there are about 65,648 males in the city that are "Black or African American."

This factor is a close call. On one hand, the caller did not only identify Norbert as a black man, but also provided his nickname, the unique attributes of his teeth, and information about his car that was mostly correct; on the other hand, the caller simply provided information that would help identify Norbert but did not provide sufficient detail to "be reliable in its assertion of

11

No. 20-60106

illegality, not just in its tendency to identify a determinate person."[27] Although the information provided was arguably sufficient to allow the police to identify Norbert, as we discuss further below, it did not provide sufficient detail to be reliable in its assertion of illegality. We agree with the district court that this factor weighs in part in favor of the Government because the tip was sufficiently specific enough to identify Norbert.

### 3. *Verification of the Information in the Tip*

Even if the credibility and reliability of an informant is not established, police officers may still have reasonable suspicion to conduct an investigatory stop if the officers are able to verify the tip.[28] In addition to police observations, a tip may be verified by reports of unlawful behavior from other, credible sources.[29] However, the corroboration of innocent information, such as a person's identification or whereabouts, "absent any corroboration of the illegal activity itself" does not in and of itself provide a basis to conduct an investigatory stop.[30] Because the tip was not presented as a 911 call or a contemporaneous emergency, or predict future behavior, the police's failure to corroborate illegal activity was insufficient verification of the tip to justify the stop.[31]

---

[27] *J.L.*, 529 at 272.

[28] *See United States v. Martinez*, 486 F.3d 855, 863 (5th Cir. 2007); *J.L.*, 529 U.S. at 270.

[29] *See United States v. Holloway*, 962 F.2d 451, 460 (5th Cir. 1992).

[30] *Martinez*, 486 F.3d at 864.

[31] *See United States v. Gomez*, 623 F.3d 265, 271 (5th Cir. 2010). As discussed earlier, it is also not clear that the caller herself witnessed the drug activity, which further distinguishes this case from *Navarette*, where the "caller necessarily claimed eyewitness knowledge of the alleged dangerous driving." *See* 572 U.S. at 399.

In *United States v. Martinez*, this Court determined that an unknown informant's tip that a man named "Angel" was storing weapons that had been used in a quadruple homicide at a particular address did not provide officers with reasonable suspicion to stop Angel when he was found at the address.[32] This Court focused on the fact that there was no evidence in the record to suggest a basis for finding the informant credible, such as whether the informant had previously dealt with the police, and therefore the reliability factor weighed against the Government.[33] Moreover, "absent any corroboration of the illegal activity itself," the officers did not have reasonable suspicion to conduct a stop; "[t]hat the police might corroborate a mountain of innocent data, such as a person's identification and whereabouts, does not provide any basis for executing a *Terry* stop on that person."[34] This Court concluded that the only verified information the police had when they stopped Angel was his name and the fact that he was in a specific residence, but "[n]otably absent" was "any verified information that 'criminal activity may be afoot.'"[35] Therefore, the tip was insufficient to give rise to reasonable suspicion to conduct a stop.[36]

We have emphasized the importance of corroborating the fact that criminal conduct has been or will be committed before conducting a stop. In *United States v. Roch*, this Court concluded that even when an officer knows an informant personally and previously obtained reliable information from

---

[32] *Martinez*, 486 F.3d at 858, 862.

[33] *Id.* at 861–62.

[34] *Id.* at 864.

[35] *Id.* at 862 (quoting *United States v. Jaquez*, 421 F.3d 338, 340–41 (5th Cir. 2005)).

[36] Id.

No. 20-60106

the informant, it was not enough for a finding of reasonable suspicion.[37] In *Roch*, a confidential informant gave a detailed description of the suspect and his white and orange pickup truck, including the fact that he was driving with a female passenger, and told police that the suspect planned to pass forged checks and had threatened to kill the next cop he saw.[38] Based on this tip, the police set up surveillance for several hours and saw the suspect drive away in the vehicle the informant described with a female passenger.[39] The police followed the suspect's vehicle and made an investigatory stop when he exited the vehicle.[40] When they looked inside the vehicle, they found two guns, which were the subject of the indictment and subsequent motion to suppress. We reversed the district court's denial of the motion because "[a]lthough reasonable suspicion is a substantially lower standard than probable cause, it still requires an indicia of reliability demonstrated by the observation of sufficient details that corroborate the informant's tip" and "while the agents could corroborate that a white man was driving a white and orange truck, they made no attempt to corroborate the driver's identity, his felon status, or his future activity."[41]

In this case, the district court concluded that because the anonymous tip was not made to 911 and it did not involve an emergency or an immediate threat to anyone's safety, the police officers should have attempted to verify or corroborate the information in some way. The only information that the police officers were able to verify through their personal observations was

---

[37] 5 F.3d 894, 898–99 (5th Cir. 1993).

[38] *Id.* at 896.

[39] Id.

[40] Id.

[41] *Id.* at 899.

"innocent data," such as Norbert's identification and the location of his car,[42] but not that he was engaged in any illegal activity. The district court thus concluded that this factor weighed strongly against a finding that the officers had reasonable suspicion to conduct an investigatory stop.

The Government alleges that the district court "went too far in insisting" that the police officers should have done more to verify that Norbert was engaged in drug sales before conducting an investigatory stop of the men in the parking lot. The Government argues that none of the men were tenants at the apartment complex and the officers found a misdemeanor amount of marijuana on one of the men to be sufficient to give the officers reasonable suspicion to conduct the investigatory stop.

A determination of whether an officer has reasonable suspicion to conduct a stop is "answered from the facts known to the officer at the time."[43] Therefore, the Government's reliance on the finding of the misdemeanor amount of marijuana during the pat down of one of the men to support a finding of reasonable suspicion is misguided, as the marijuana was found as a result of the stop and not before it. To the extent that the Government is arguing that the officers believed that the men were unlawfully gathered in the parking lot, it does not explain how this supports their informant's complaint of drug activity; the tip did not include any allegations of trespassing.[44]

---

[42] *See United States v. Martinez*, 486 F.3d 855, 864 (5th Cir. 2007).

[43] *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008).

[44] Moreover, as a factual matter, the Government is incorrect to suggest that none of the men resided at the apartment complex. Lavine testified that one of the men said that he was residing in an unleased apartment with the permission of his father, a maintenance man at the apartment complex.

Accordingly, the district court did not err in concluding that the tip as to illegal drug activity was not adequately corroborated by police observations. The "facts known to the officer[s] at the time" indicate that the officers only knew that "N.O." and his vehicle were at the apartment complex.[45] As we have held, "absent any corroboration of the illegal activity itself, 'the government had no reasonable suspicion that the criminal activity suggested by the informant was afoot.'"[46]

### 4. Recentness of the Tip

Whether or not a tip has gone stale "is to be determined on the facts of each case."[47] Staleness cannot "be determined by simply a 'mechanical counting of the time between' the time the tip is received and the time the tip is used."[48] Instead, "whether a tip has gone stale depends upon the nature of the tip and the nature of the criminal activity alleged."[49] This Circuit has

---

[45] *See Vickers*, 540 F.3d at 361.

[46] *Martinez*, 486 F.3d at 864 (quoting *Roch*, 5 F.3d at 899). For this reason, *Alabama v. White*, 496 U.S. 325 (1990), upon which the dissent relies, is also distinguishable. Central to the Supreme Court's conclusion in that case that the officers had reasonable suspicion to conduct a stop was the fact that the informant provided verifiable information about the suspect's future illegal activity. *Id.* at 330–31; *see also Florida v. J.L.*, 529 U.S. 266, 271 (2000) (classifying *White* as a "close call" and holding that an informant's failure to provide "predictive information" about illegal conduct counsels against a finding of reliability); *Martinez*, 486 F.3d at 863 n.6 ("We note that the tipster did state that he expected Angel to leave for Mexico with the guns. This is a predictive statement about future behavior, to be sure, but it was not verified in any way and thus could not contribute to any reasonable suspicion."). Here, the caller provided no such information that would have allowed the officers to confirm that drug sales were going to take place.

[47] *United States v. Webster*, 734 F.2d 1048, 1056 (5th Cir. 1984).

[48] *United States v. Gonzalez*, 190 F.3d 668, 673 (5th Cir. 1999) (quoting *Webster*, 734 F.2d at 1048).

[49] Id.

found a tip to be "exceedingly fresh" when officers initiated a traffic stop "approximately two hours" after an informant's call gave them a tip,[50] and it has also found a two-month old tip not stale because "the informant described a particular vehicle that had made multiple smuggling trips, thus warranting the presumption that it was engaged in continuous activity."[51]

The district court concluded that even though McClinton received the call from the informant in the morning and did not investigate it until the night, the caller "alleged an ongoing pattern of illicit drug sales" and the tip was therefore not stale under the circumstances. We agree that this factor weighs in favor of the police officers and Government.

### 5. Balancing the Factors

"In reviewing a district court's ruling on a motion to suppress, we accept findings of fact unless clearly erroneous, but review de novo the ultimate conclusion on Fourth Amendment issues drawn from those facts."[52] Still, "[w]e view the evidence in the light most favorable to the party that prevailed in the district court," which in this case is Norbert.[53] A district court's ruling on a suppression motion should be upheld "if there is any reasonable view of the evidence to support it."[54]

In this case, the district court noted that the verification factor controlled its decision in determining whether the police officers had

---

[50] *United States v. Powell*, 732 F.3d 361, 370–71 (5th Cir. 2013).

[51] *United States v. Villalobos*, 161 F.3d 285, 290 (5th Cir. 1998).

[52] *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (citations omitted).

[53] *See United States v. Chavez*, 281 F.3d 479, 483 (5th Cir. 2002).

[54] *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc) (citation omitted).

reasonable suspicion to conduct the investigatory stop. As we discuss above, although police officers generally do not need to verify or corroborate tips from citizens reporting crimes to emergency services, in this case, the phone call was not made to 911 and it did not involve an emergency or immediate threat to safety. The district court therefore concluded that the officers should have attempted to verify the tip in some way before conducting the investigatory stop. The district court emphasized the fact that the officers were only able to corroborate innocent information—Norbert's identification and the car's location—from the anonymous tip, which "[did] not provide any basis for executing a *Terry* stop."[55]

Viewing the evidence in the light most favorable to Norbert,[56] we conclude that the district court's ruling should be affirmed because "there is [a] reasonable view of the evidence to support it."[57] In summary, the innocent information from the tip allowed the officers to identify Norbert and his car in the parking lot, but the officers patted all the men down after only verifying this "innocent information." Inexplicably, the officers did not get the informant's name or phone number when she called, and she did not clearly advise the officers that she had personally observed any illegal drug activity. The officers also did not observe any drug activity occurring, nor did they attempt to speak with someone in the management office to identify who had phoned in the tip. Therefore, the district court did not err in concluding

---

[55] *See United States v. Martinez*, 486 F.3d 855, 864 (5th Cir. 2007).

[56] *Chavez*, 281 F.3d at 483.

[57] *Michelletti*, 13 F.3d at 841 (citation omitted). The dissent also fails to explain how, using this Circuit's standard of review, there is no "reasonable view of the evidence" to support the district court's ruling suppressing the evidence in this case. *See id.*

that the officers lacked the reasonable basis required to conduct an investigatory stop.

Finally, the Government does not challenge the district court's conclusion that the gun and Norbert's statements should be suppressed as "fruit of the poisonous tree" of the unlawful investigatory stop.[58] Rather, the Government only argues that the police officers had reasonable suspicion to conduct the stop in the first place. Thus, because the gun was found and the statements were made as a result of the unlawful stop, the district court did not err in concluding that they should be excluded as fruit of the poisonous tree.

The main problem with the dissent is its refusal to recognize the standard of review that we must apply in this case. The district court found that the informant's tip lacked credibility and reliability. The district court then proceeded to fault the police officers for relying on an anonymous tip from an informant they did not know who claimed to be one of the managers of an apartment complex. The officers did not get the informant's name or her telephone number and, without verifying any of this information, arrived at the apartment complex eight hours later to investigate. The court emphasized that the officers were only able to corroborate innocent

---

[58] The district court concluded that "[b]ased on the record, the gun and Norbert's statements were derived solely from the illegal *Terry* stop" because the deputies were only able to identify the car as Norbert's after he was stopped. The police officers also stated that they discovered Norbert's criminal history from either the statements he made during the stop or from their call to dispatch after requesting his identification, neither of which would have occurred absent the unlawful stop. The district court found that there was no "break in the chain of events sufficient to refute the inference that the evidence was a product of a Fourth Amendment violation" and therefore, Norbert's statements and the gun had to be suppressed as fruit of the poisonous tree. The Government does not challenge the district court's conclusion that the gun and Norbert's statements should be suppressed as "fruit of the poisonous tree" of the unlawful stop.

No. 20-60106

information, such as the defendant and car's description, and this did not support executing a *Terry* stop.

The testimony of McClinton, the investigating officer, reflects that the informant's call was predicated primarily on tenants' reports of drug activity and their safety concerns. The dissent accepts the Government's interpretation of the informant's statement that she "saw certain activity" to mean that she personally witnessed drug activity in the parking lot. Given that the law requires us to view the evidence in the light most favorable to Norbert—the prevailing party in district court—it is not unreasonable to conclude that this statement that the informant "saw certain activity" was not definitive enough to mean that she personally saw illegal drug activity. As we indicate earlier in the opinion, the district court could have reasonably found that the activity the informant saw was increased or unusual activity in the parking lot. Although she gave the officers a description of the defendant and a description of his automobile, including a license plate number (just one digit off), this information could have easily been relayed to an apartment manager by her tenants. We must uphold the district court's ruling "if there is any reasonable view of the evidence to support it."[59] It is clear to us that the district court was not obliged to accept the Government's interpretation of the vague term "certain activity" to mean that the informant personally witnessed illegal activity.

The dissent accuses us of ignoring *Navarette* and disregarding *White*. The majority opinion reflects that we have a detailed discussion of each case that explains why we think they do not control. In *Navarette*, for example, the Supreme Court allowed a 911 emergency call to serve as the basis for

---

[59] *See Michelletti*, 13 F.3d at 841.

No. 20-60106

reasonable suspicion, but that case is distinguishable from this case, where the call did not report an emergency and the investigation was conducted some eight hours later with ample opportunity for the officers to verify the anonymous tip. Moreover, in each of those cases, the Court was reviewing a district court's order denying the motion to suppress. Accordingly, these two Supreme Court cases are distinguishable from the case at hand.

## III.    CONCLUSION

Viewing the evidence in the light most favorable to Norbert, and because there is a reasonable view of the evidence supporting the district court's ruling, we AFFIRM the district court's order suppressing the gun and Norbert's statements.

ANDREW S. OLDHAM, *Circuit Judge*, dissenting:

Today's majority holds that a police officer cannot conduct a *Terry* stop until he personally witnesses the commission of a crime and hence has probable cause to make an arrest. Of course, *Terry* itself held that officers need mere *reasonable suspicion*—far less than *probable cause*—to stop someone. *See Terry v. Ohio*, 392 U.S. 1 (1968). More than 50 years of Fourth Amendment cases depend on that distinction. So the majority's decision to underrule it will have grave consequences that extend far beyond this case. I respectfully but emphatically dissent.

I.

Ordinarily, I'd start with the constitutional text and the original public understanding of it. The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. That text says nothing about suppression. *See United States v. Leon*, 468 U.S. 897, 906 (1984) ("The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands."). To the contrary, the common-law rule at the Founding rejected suppression as a Fourth Amendment remedy. *See Bishop Atterbury's Trial*, 16 How. St. Tr. 323, 640 (1723); WILLIAM J. CUDDIHY, THE FOURTH AMENDMENT: ORIGINS AND ORIGINAL MEANING 602–1791, at 431 (2009) ("The common law . . . rejected the exclusionary rule decisively in *Bishop Atterbury's Case.* . . .").

Suppression instead is a post-Founding, "judicially created" remedy. *Leon*, 468 U.S. at 906 (quotation omitted); *accord United States v. Beaudion*, 979 F.3d 1092, 1097 (5th Cir. 2020). Therefore, the question presented is whether Supreme Court precedent commands suppression of the evidence against Norbert. It does not. To the contrary, Supreme Court precedent

No. 20-60106

unambiguously says that the officers had reasonable suspicion to stop Norbert. And once they had reasonable suspicion, everyone agrees the case is over.

A.

Let's start with the officers' right to stop Norbert. The Supreme Court's landmark *Terry* decision holds that "[a] temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place." *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013) (citing *Terry*, 392 U.S. at 30–31). "Reasonable suspicion" is not a concept that appears in the Constitution. But Supreme Court precedent tells us that it is not difficult to find. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) (requiring officers to have "some minimal level of objective justification for making [a] stop" (quotation omitted)). The requisite suspicion "is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Sokolow*, 490 U.S. at 7).

This "minimal" standard also applies when officers make a stop based on a tip. *See ibid.* ("We have firmly rejected the argument that reasonable cause for an investigative stop can only be based on the officer's personal observation . . . ." (quotation omitted)). The question is simply whether a tip carries "sufficient indicia of reliability" for officers to act on it. *Ibid.* (quoting *Alabama v. White*, 496 U.S. 325, 327 (1990)).

The Supreme Court's decisions in *White* and *Navarette* are instructive. *White* involved an anonymous tip that a woman would transport cocaine from a particular apartment building to a particular motel in a particular vehicle. *See* 496 U.S. at 327. After confirming some of the innocent

23

details, the officers stopped the vehicle and discovered cocaine. *See ibid.* The Supreme Court acknowledged that "not every detail mentioned by the tipster was verified." *Id.* at 331. It also noted that "the tip g[ave] absolutely no indication of the basis for the caller's predictions." *Id.* at 329 (quotation omitted). But it still upheld the stop as supported by reasonable suspicion. *See id.* at 332. The lack of complete corroboration was unproblematic "because an informant [who] is shown to be right about some things . . . is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity." *Id.* at 331. And the tipster's unexplained basis of knowledge was unproblematic because "the caller's ability to predict respondent's future behavior . . . demonstrated inside information—a special familiarity with respondent's affairs." *Id.* at 332. So "under the totality of the circumstances," the partially corroborated and fully unexplained tip "exhibited sufficient indicia of reliability to justify the investigatory stop." *Ibid.*

*Navarette* reached the same conclusion. The police in that case received an anonymous 911 call from a driver who reported being run off the road by a pickup truck with an identified license plate at a specific time and location. *See* 572 U.S. at 395. After spotting the truck and following it for five minutes, an officer pulled it over and discovered marijuana. *See ibid.* The Supreme Court again held that reasonable suspicion justified the stop. *See id.* at 404. It found "significant support [for] the tip's reliability" in the fact that "the caller . . . claimed eyewitness knowledge of the alleged dangerous driving." *Id.* at 399. It also noted that "a reasonable officer could conclude that a false tipster would think twice before using . . . a [911] system" that records calls and other information about the caller. *Id.* at 400–01. And it dismissed the suggestion that the officer's failure to corroborate illegal activity in the five minutes he followed the truck somehow negated the reasonable suspicion he had just acquired. *See id.* at 403–04. As the Court put

it, "we have consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.'" *Id.* at 403 (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).

These principles definitively prove that officers had reasonable suspicion to *Terry* stop Norbert. First, the informant was an eyewitness. She told Officer McClinton "that she had seen" the drug-dealing. So just like the caller in *Navarette*, the caller here "claimed eyewitness knowledge" of the tip's substance. 572 U.S. at 399.

Second, our informant was far from anonymous. She provided a substantial amount of information about herself. She told the police that she worked at the Millsaps Apartments in Jackson, Mississippi, that she was a manager there, and that she had lodged the same complaint with other law enforcement agencies in the past.

That makes our tipster *even more* reliable than those in *White* and *Navarette*. The tipster in *White* failed to "indica[te] . . . the basis for" his complaint. 496 U.S. at 329 (quotation omitted). The tipster here did not— she specified that she personally witnessed the drug-dealing *for days*. The tipsters in both *White* and *Navarette* were completely "anonymous." *See White*, 496 U.S. at 327; *Navarette*, 572 U.S. at 396 n.1, 398. The tipster here was not—she identified herself as the manager of the apartment complex where Norbert was dealing drugs. And the tipster in *Navarette* was likely unaware that police could trace the tip to its source. *See* 572 U.S. at 409 (Scalia, J., dissenting) ("There is no reason to believe that your average anonymous 911 tipster is aware that 911 callers are readily identifiable."). The tipster here was acutely aware—she identified herself and pleaded for police to help with the repeated and rampant drug-dealing in her parking lot. Our tipster was not some anonymous woman on the road somewhere; our tipster begged the police to come to her and restore the safety of her workplace.

No. 20-60106

Third, the informant's tip was corroborated. Consider all the details the informant provided that officers confirmed *before* they performed their *Terry* stop:

- Norbert's location
- Norbert's physical description
- Norbert's nickname
- Norbert's presence among multiple suspects
- The location of Norbert's car
- The color of Norbert's car
- The make of Norbert's car
- The model of Norbert's car
- The license plate on Norbert's car
- The ongoing nature of the reported activity

That is more than enough corroboration to create reasonable suspicion according to *White* and *Navarette*. *See White*, 496 U.S. at 327 (finding reasonable suspicion upon corroboration of vehicle, time, and location); *Navarette*, 572 U.S. at 395 (same).

The single detail that police were unable to verify was Norbert's personal participation in drug activity. And that detail is irrelevant. Had the police corroborated that, they would've left the lesser realm of reasonable suspicion and arrived at probable cause to arrest Norbert on the spot. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). In fact, the officers may have had probable cause on the facts as they are, even without corroborated drug activity. *See Illinois v. Gates*, 462 U.S. 213, 225–27, 243 (1983) (finding a "compelling" showing of probable cause to support a drug search where

No. 20-60106

police corroborated information provided by an anonymous tipster without corroborating any drug activity); *id.* at 242 ("[I]n making a warrantless arrest an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." (quotation omitted)). So it's difficult to see how the officers lacked reasonable suspicion—a standard that is "obviously less than . . . probable cause." *Navarette*, 572 U.S. at 397 (quotation omitted).[1]

### B.

Once it's established that officers had reasonable suspicion to *Terry* stop Norbert, everyone agrees his suppression motion fails. Norbert's sole argument before the district court and on appeal is that the Government lacked sufficient suspicion for its stop. The district court adopted Norbert's framing of the case. And the majority adopts it too. *See ante*, at 20–21. Because Supreme Court precedent squarely supports the officers' stop, Norbert's suppression motion must be denied.

---

[1] Police had reason to be suspicious even apart from the tip and its corroboration. For example, one officer testified that he asked the group in the parking lot whether they lived in the apartment complex "and [they] all said, no, . . . they did not." *Cf. United States v. Andrews*, 103 F. App'x 855, 856 (5th Cir. 2004) (per curiam) (finding reasonable suspicion of drug activity where officers spotted the suspect in a parking lot known for drug trafficking and the suspect admitted he didn't live nearby). Another officer testified that Norbert "stated kind of jokingly, 'Man, I started to run, but then I realized there was some more of you all on the other side. So I just turned around and came back.'" *Cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (finding reasonable suspicion based on a suspect's "unprovoked flight upon noticing the police" because "[h]eadlong flight . . . is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such"). The majority says that Norbert's remark about running occurred "[a]fter the pat down." *Ante*, at 5. But the record says the opposite; Officer Lavine indicated that the comment came at the very beginning of his interaction with Norbert.

No. 20-60106

## II.

So why does the majority toss the Government's evidence? First, the majority misstates the facts. Second, it misstates the law. Both mistakes are regrettable. But the majority's misstatement of law is particularly problematic because it disregards Supreme Court precedent and leaves considerable confusion over the Fourth Amendment in its wake.

## A.

The majority's resolution of this case is built on counterfactual assertions. For example, the majority repeatedly says this case involves an "anonymous" tip, *ante*, at 2, 6, 8, 9, 20, from an "unknown, unaccountable informant," *id.* at 11 (quoting *Florida v. J.L.*, 529 U.S. 266, 271 (2000)). It's true that the informant in *J.L.* was "anonymous," "unknown," and "unaccountable"; "nothing [wa]s known about the informant." 529 U.S. at 268. But here the officers knew a great deal about their caller. *See supra* Part I.A. And based on that knowledge they had plenty of reasons to trust her. *See ibid.*

The majority also says it's "unclear whether the caller witnessed the alleged drug activity herself or if she was only told about it by residents." *Ante*, at 3. The purported lack of clarity comes from an exchange at the suppression hearing in which the district court asked Officer McClinton if the caller had personally "seen certain activity" and McClinton responded "Yes." According to the majority, the question's focus on "certain" activity instead of "criminal" activity means we can't be sure the caller ever saw drugs. *See id.* at 3 n.8. Perhaps she merely saw "individuals and vehicles in the parking lot [that] she did not believe belonged there." *Ibid.*

Once again, the record forecloses the majority's counterfactual narrative. Here is the entirety of Officer McClinton's responses to the district court's cross-examination:

No. 20-60106

Q. The caller indicated that he or she—he or she—do you recall whether it was—which one, he or she?

A. I do.

Q. What was it?

A. It was a female.

Q. Okay. So the caller identified herself as someone from management and indicated that—did she indicate that she had seen certain activity?

A. Yes.

Q. And that she had complained about it to others?

A. Yes.

Q. And wanted you all to come check on it, because nobody else did?

A. Yes, sir.

Who could read this transcript and think the "certain activity"—mentioned *only by the district court*—was anything other than drug activity? The entire record in this case makes one thing clear and undisputed: the apartment manager repeatedly called the police to complain about drug activity. That's what the officers said.[2] That's what the police report said.[3] That's what everyone said. At no point did anyone complain to police officers about individuals congregating in the apartment parking lot to do anything *other* than deal drugs. *Contra ante*, at 3 n.8. The majority's contrary speculation is

---

[2] McClinton testified that he "received a complaint to [his] office of illicit narcotics activity taking place in the parking lot of th[e] apartment complex." He also testified that "the complaint identif[ied] . . . subjects that were out dealing in illicit narcotics."

[3] The police report said: "On Wednesday November 29, 2017, I, investigator Felix McClinton received a complaint that illicit narcotics were being sold in the parking lot of the Millsaps Apartments located at 333 Millsaps Avenue in the City of Jackson."

built on nothing but what-ifs, maybes, and the phraseology of a question asked by the district court.

What's worse, the majority's insistence on changing the facts does nothing to justify its judgment. Let's suppose for a moment that only the residents saw the drugs, while the manager-informant only saw the alleged drug dealers congregating in the parking lot of an apartment building for hours and days at a time while none of them lawfully resided there. That is directly analogous to *Navarette*. The 911 caller in that case did not assert personal knowledge of drunk driving; she asserted personal knowledge of suspicious behavior consistent with drunk driving. *See* 572 U.S. at 401–03 (holding that "the 911 caller's report of being run off the roadway created reasonable suspicion of an ongoing crime such as drunk driving"); *id.* at 409 (Scalia, J., dissenting) (opining that the 911 call "neither asserts that the driver was drunk nor even raises the likelihood that the driver was drunk" (emphasis omitted)). Even so, the *Navarette* caller still "claimed eyewitness knowledge" of unusual activity—and "[t]hat basis of knowledge len[t] significant support to the tip's reliability." *Id.* at 399. The same is true of the caller here. And it remains true even on the majority's counterfactual rendition of what happened.

## B.

The majority next misstates the law. Its entire opinion rises and falls on a single legal contention: "absent any corroboration of the illegal activity itself, the government had no reasonable suspicion that the criminal activity suggested by the informant was afoot." *Ante*, at 17–18 (quotation omitted); *see also id.* at 14, 15, 16, 19, 20 (reiterating this principle). But the Supreme Court recently and emphatically rejected that claim. And with good reason. The majority's rule turns the Fourth Amendment on its head.

No. 20-60106

1.

In *Navarette*, the police did nothing to independently corroborate criminal activity. An officer located the suspect vehicle and followed it for five minutes but failed to detect even the slightest hint of a traffic violation or anything suspicious. *See* 572 U.S. at 403; *id.* at 411–12 (Scalia, J., dissenting). In other words, the police lacked "any corroboration of the illegal activity itself." *Ante*, at 17–18 (quotation omitted). But the Supreme Court still found reasonable suspicion. *See Navarette*, 572 U.S. at 404. That alone proves that the foundational premise of the majority opinion is wrong.

And the reasoning in *Navarette* poses even more problems for the majority. The Court began with its "consistent[] recogni[tion] that reasonable suspicion need not rule out the possibility of innocent conduct." *Id.* at 403 (quotation omitted). Then it added:

> [T]he absence of additional suspicious conduct, after the vehicle was first spotted by an officer, [did not] dispel the reasonable suspicion of drunk driving. It is hardly surprising that the appearance of a marked police car would inspire more careful driving for a time. Extended observation of an allegedly drunk driver might eventually dispel a reasonable suspicion of intoxication, but the 5-minute period in this case hardly sufficed in that regard. Of course, an officer who already has such a reasonable suspicion need not surveil a vehicle at length in order to personally observe suspicious driving. Once reasonable suspicion of drunk driving arises, the reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques.

*Id.* at 403–04 (citations and quotations omitted). That passage should be the end of this case; today's majority can do nothing but ignore it.

31

No. 20-60106

2.

The majority offers three responses. First, it quotes Supreme Court precedent for the proposition that a "tip must 'be reliable in its assertion of *illegality*, not just in its tendency to identify a determinate person.'" *Ante*, at 9, 11 (quoting *J.L.*, 529 U.S. at 272) (emphasis added by the majority). That's certainly true. But the whole point of *Navarette* is that a tip can reliably assert illegality even when the illegality itself isn't corroborated. *See* 572 U.S. at 398 (explaining that "confirming the innocent details" often leads to reasonable suspicion because "an informant who is proved to tell the truth about some things is more likely to tell the truth about other things, *including the claim that the object of the tip is engaged in criminal activity*" (emphasis added) (quotation omitted)); *id.* at 403–04 (holding officers had reasonable suspicion even though they hadn't corroborated illegality).

Second, the majority relies on circuit precedent for its strict corroboration requirement. *See ante*, at 14–16 (discussing *United States v. Roch*, 5 F.3d 894 (5th Cir. 1993); *United States v. Martinez*, 486 F.3d 855 (5th Cir. 2007)). But that line of defense fails too.

For one thing, the facts in *Roch* and *Martinez* are far afield. *Roch* involved a minimally detailed, mostly uncorroborated tip. *See* 5 F.3d at 898 (indicating that the suspect vehicle was "only described by its . . . color" without the "make, model, year of manufacture, or license number"); *id.* at 899 (observing that police failed to "corroborate the driver's identity, his felon status, or his future activity"). And that's far from what we have here. *See supra* Part I.A. *Martinez* involved a truly "anonymous" tipster. *See* 486 F.3d at 861 (noting that the Government "never introduced any evidence about the informant whatsoever" and "knew only that the police department had received information 'from another person'"). Again, that's not close to today's case. *See supra* Parts I.A, II.A.

32

No. 20-60106

The law in *Roch* and *Martinez* doesn't help the majority either. *Roch* expressly recognized that "[r]easonable suspicion . . . does not have to be based on a[n] [officer's] personal observation" of criminal activity. 5 F.3d at 898. And while *Martinez* inexplicably abandoned that rule, the rule it created is squarely contradicted by *Navarette*. Compare *Martinez*, 486 F.3d at 864 ("That the police might corroborate a mountain of innocent data, such as a person's identification and whereabouts, does not provide any basis for executing a *Terry* stop on that person."), *with Navarette*, 572 U.S. at 398, 403–04 (holding police obtained reasonable suspicion by "confirming the innocent details" of an anonymous tip). So we mustn't follow it. *See Gahagan v. U.S. Citizenship & Immigr. Servs.*, 911 F.3d 298, 302 (5th Cir. 2018) ("Three-judge panels abide by a prior Fifth Circuit decision until the decision is overruled, expressly or implicitly, by . . . the United States Supreme Court . . . . Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion establishes a rule of law inconsistent with that precedent." (quotations omitted)).

*Navarette* binds us. It is the Supreme Court's most-recent decision on this topic. And it postdates *Martinez* by 7 years. We have zero excuse for ignoring *Navarette*.

Third, the majority says we can ignore *Navarette* because unlike the tip in that case, "the information provided [here] was not an emergency reported contemporaneously to 911 that required immediate action." *Ante*, at 11, 14. That's puzzling to say the least. When it comes to reliability, the differences between the phone call in this case and the 911 call in *Navarette* actually *help* the Government. *See supra* Part I.A. And when it comes to corroboration, *Navarette*'s emergency posture has nothing to do with its general recognition that police can have reasonable suspicion without "personally observ[ing] suspicious [activity]." 572 U.S. at 404. For example, *Navarette* relied on *White* for its observation that tipsters who are "proved to

tell the truth" about "innocent details" are "more likely to tell the truth" about the defendant's "criminal activity." *Id.* at 398 (quotation omitted). And *White* was a non-emergency drug case just like this one. *See id.* at 397; *supra* Part I.A.[4] The only link the *Navarette* Court made between emergencies and corroboration was its statement that drunk-driving cases "would be a particularly inappropriate context" to abandon the "settled rule" that "the reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques." 572 U.S. at 404 (quotation omitted). The Supreme Court stuck with its settled rule, and the majority should have too.

3.

Two important consequences follow the majority's refusal to do so. First, the majority prohibits police work that the text of the Constitution expressly permits. The Fourth Amendment contemplates searches and seizures based "upon probable cause." U.S. CONST. amend. IV. Probable cause requires "a fair probability" that a suspect has committed a crime. *Gates*, 462 U.S. at 238. But the majority requires absolute certainty—even "mountain[s] of . . . data" are not enough unless the police personally corroborate an ongoing crime. *Ante*, at 15 (quotation omitted). And the majority applies its absolute-certainty requirement to a reasonable-suspicion framework that demands even less than the "fair probability" of probable

---

[4] The majority says we can ignore *White* too—apparently because the informant in that case predicted "the suspect's future illegal activity" while the informant here did not. *Ante*, at 18 n.88. The majority's contention is factually untrue. The informant here made a prediction: she reported an ongoing pattern of drugs in the parking lot that would likely recur. The majority's contention is also legally irrelevant. The police in *White* didn't verify any illegal activity before the stop. *See* 496 U.S. at 327. Yet *White* still held that "when the officers stopped respondent, the anonymous tip had been sufficiently corroborated to furnish reasonable suspicion that respondent was engaged in criminal activity." *Id.* at 331.

cause. *See supra* Part I.A. Our court has rejected that position in other cases. *See United States v. Williams*, 880 F.3d 713, 718–19 (5th Cir. 2018) ("This court has recognized that under *Terry*, officers may briefly detain an individual on the street for questioning, without probable cause, when they possess reasonable, articulable suspicion of criminal activity." (quotation omitted)); *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993) ("Reasonable suspicion is considerably easier for the government to establish than probable cause." (quotation omitted)). I fail to see how we can embrace it here.

Second, the majority's criminal-corroboration rule creates a circuit split. *See, e.g.*, *United States v. Wanjiku*, 919 F.3d 472, 488 (7th Cir. 2019) ("Although . . . there may be innocent explanations for some of the facts on which the officers relied, reasonable suspicion need not rule out the possibility of innocent conduct." (quotation omitted)); *United States v. Matchett*, 802 F.3d 1185, 1192 (11th Cir. 2015) ("Although [police] did not observe any illegal activity, a reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." (quotation omitted)); *United States v. Diaz*, 802 F.3d 234, 239–40 (2d Cir. 2015) (reversing district court's grant of motion to suppress because it ignored circuit precedent holding that "reasonable suspicion need not rule out the possibility of innocent conduct" (quotation omitted)); *United States v. Alvarez*, 899 F.2d 833, 838 (9th Cir. 1990) ("It is not uncommon for seemingly innocent conduct to provide the basis for reasonable suspicion. The fact that the officers did not actually observe any criminal activity is irrelevant . . . ." (citations and quotations omitted)). That only heightens the unfortunate confusion sown by today's mistake.

\*         \*         \*

The Fourth Amendment is not a judicial license to promulgate our Wishlist of Best Police Practices. *See United States v. Kahn*, 415 U.S. 143, 155 n.15 (1974) (noting that warrants often "pass muster under the Fourth Amendment" even when they do not comply with "best practice"); *United States v. Scully*, 951 F.3d 656, 665 (5th Cir. 2020) (upholding police action even "[t]hough the Government could have done more"); *United States v. Glenn*, 966 F.3d 659, 661 (7th Cir. 2020) (Easterbrook, J.) ("The Fourth Amendment does not require best practices in criminal investigations."). The majority's speculations—about what the officers *could've* done, what the majority wishes they *would've* done, and what the majority therefore surmises they *should've* done—are beside the point. Decades of Supreme Court decisions support what the officers *actually* did. That same precedent squarely forecloses the majority opinion. I respectfully dissent.